IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| PEDRO PERERA, | ) | |
| | ) | |
| Plaintiff, | ) | CV-04-1668-ST |
| | ) | |
| v. | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| BLUE RIBBON INSTALLATIONS, INC., a | ) | |
| Washington Corporation, ALEGIS GROUP, L.P., | ) | |
| a Delaware Limited Partnership, CYNTHIA M. | ) | |
| PENNINGTON, nka CYNTHIA M. GANN, | ) | |
| | ) | |
| Defendants. | ) | |

STEWART, Magistrate Judge:

## **INTRODUCTION**

This case arises from a loan obtained by plaintiff Pedro Perera ("Perera") to finance the

installation of new vinyl siding on his home by defendant Blue Ribbon Installations, Inc. ("Blue

Ribbon"). The parties dispute whether that loan was secured by a Deed of Trust notarized by

defendant Cynthia M. Pennington, nka Cynthia M. Gann ("Gann") and whether it was

discharged in Perera's Chapter 7 bankruptcy. After the bankruptcy, defendant Alegis Group,

L.P. ("Alegis"), a debt collection company, attempted to collect the amount due from Perera and threatened to foreclose the Deed of Trust.

In response, Perera brings this action seeking declaratory relief under 28 USC §§ 2201 *et seq* (First Claim) against Alegis, as well as the following claims: (1) violations of the Fair Debt Collections Practice Act, 15 USC § 1692 ("FDCPA"), against Alegis (Second Claim); (2) violations of the Oregon Unlawful Debt Collections Practices Act, ORS 646.639 ("OUDCPA"), against Alegis (Third Claim); (3) violations of the Notary Act of Oregon, ORS 194.166(11), against Gann (Fourth Claim); (4) slander of title against Blue Ribbon and Alegis (Fourth Claim); and (5) fraud against Blue Ribbon and Gann (Fifth Claim). On the FDCPA claim, he seeks statutory damages of $1,000 per violation, compensatory damages of not less than $100,000, and punitive damages. On the OUDCA claim, he seeks actual damages or $200, whichever is greater, punitive damages and attorney fees. On his Notary Act claim, he seeks actual damages or $200, whichever is greater, compensatory damages of $80,000, and attorney fees. His slander of title claim seeks compensatory damages of $25,000, and his fraud claim seeks compensatory damages of $80,000 and punitive damages of $50,000.

Alegis moves for summary judgment (docket # 32) because Perera's exclusive remedy is a contempt proceeding under the Bankruptcy Code and also because Perera is estopped to deny the lien. Gann also moves for summary judgment against Perera's claims for violation of the Notary Act of Oregon and fraud (docket # 40) based on a failure of proof and the same grounds asserts by Alegis. For the reasons set forth below, both motions should be granted.

///

**STANDARDS**

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law." The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial." *Id* at 324, citing FRCP 56(e). The court must "not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial." *Balint v. Carson City*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted). A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987). The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Id* (citation omitted). Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party. *Id* at 630.

## BACKGROUND

Perera is from Cuba and does not read or speak English very well. Declaration of Pedro Perera ("Perera Dec"), ¶ 6. Around December 4, 1999, pursuant to a home solicitation, he agreed to purchase vinyl siding from Blue Ribbon for his home located at 6758 SE 77th Ave., Portland, Oregon (the "Property"). *Id*, ¶ 2. On December 11, 1999, he met with two representatives of Blue Ribbon in his home and entered into a Retail Installment Contract to pay

$11,127 in installment payments of $138.29 for 240 months with interest accruing at the rate of 13.997% ("Loan"). *Id*, ¶ 2 & Exhibit 1. The copy of the Retail Installment Contract given to Perera was not dated and did not have checked either the box stating that the contract was secured by a mortgage or deed of trust or the box stating that he was giving a security interest in the Property. *Id*. However, in addition to the finance charge, the contract included amounts to be paid for title, credit, recording, and flood fees.

Perera received a letter from TMS Mortgage, Inc. d/b/a The Money Store ("The Money Store") dated December 8, 1999, that his loan had been denied due to "[i]ncome insufficient for amount of credit requested" and a notice dated December 9, 1999, that The Money Store may purchase his contract. *Id*, ¶¶ 3-5 & Exhibits 2-4. Nothing in that correspondence mentioned a security interest, deed of trust or mortgage.

In January 2000, Perera was notified that The Money Store had purchased his contract from Blue Ribbon and that HomEq Servicing Corporation ("HomEq") would service his account. On February 4, 2000, The Money Store recorded a Line of Credit Deed of Trust ("Deed of Trust") on the Property as collateral to secure the Loan. Declaration of Michael J. Farrell ("Farrell Dec"), Exhibit G. Although the Deed of Trust was purportedly signed by Perera on December 11, 1999, Perera states that he never knowingly signed the Deed of Trust and never met Gann who claims to have notarized his signature. Perera Dec, ¶¶ 6-7.

On November 14, 2002, Perera filed for relief under Chapter 7 of the Bankruptcy Code which stayed all collection activity against Perera and his property pursuant to 11 USC § 362. Farrell Dec, Exhibit I. He listed the Loan owed to HomEq as unsecured on Schedule F and did not otherwise indicate that the Loan was in any way disputed. By letter dated November 20,

2002, HomEq's counsel contacted Perera's bankruptcy counsel to inquire as to Perera's intention with respect to the Loan and Property.  *Id*, Exhibit C.  That letter referred to HomEq as a "secured creditor" and proposed that Perera reaffirm the debt pursuant to 11 USC § 524(c). HomEq sent another letter December 10, 2002, advising that Perera's account was past due and that autodrafting of monthly payments had ceased during the pendency of the bankruptcy.  *Id*, Exhibit C.  Perera's counsel responded by letter dated January 27, 2003, stating that his client believed the Loan was unsecured, as evidenced by both the Retail Installment Contract with Blue Ribbon and Perera's recollection, and by asking HomEq's counsel to provide "proof of security."  *Id*, Exhibit E.  By letter dated February 13, 2003, HomEq's counsel provided a copy of the Deed of Trust evidencing the security interest.  *Id*, Exhibit G.  Perera did not challenge the purported lien on the Property in his bankruptcy case and did not list any claims against Blue Ribbon and Gann on his schedules of assets.

A week later on February 21, 2003, Perera received an Order of Discharge from the bankruptcy court.  By notice dated that same day, Alegis advised Perera that the servicing of his mortgage had been transferred from HomEq to Alegis and that future payments should be made to Alegis.  *Id*, Exhibit H.  By letter dated March 17, 2003, Alegis asked Perera's bankruptcy counsel to state Perera's intentions with respect to the Property that secured the Loan and also stated that: "Given the pending bankruptcy proceedings, we are not attempting to collect the debt as the personal liability of the borrower.  However, the mortgage is now due for post-petition payments."  *Id*, Exhibit J.  Perera's counsel responded on April 18, 2003, that collection activities against Perera would be a violation of the bankruptcy law and consumer law since there was no secured debt.

Perera alleges that Alegis sent him another letter on August 6, 2003, in an attempt to collect the debt despite the discharge of the debt in bankruptcy. Complaint, ¶ 5.4. In its Amended Answer, ¶ 22, Alegis admits sending the letter, but the letter is not in the record.

In October 5, 2004, Alegis's attorney sent a notice addressed to Perera's spouse that the Loan was in default and that if the default was not cured by November 5, 2004, Alegis would accelerate the mortgage loan debt and initiate foreclosure proceedings on the Property. *Id*, Exhibit L. On November 15, 2004, Perera commenced this action, alleging that he did not sign the Deed of Trust or, alternatively, that his signature was obtained fraudulently.

From 2000 through 2002, Perera received interest statements from HomEq. Perera Dec, ¶ 9. His girlfriend placed them in a drawer with other financial documents. *Id*. Later he gave all of his documents in that drawer to his accountant who prepared his tax returns. *Id*. Those tax returns list a deduction for mortgage interest paid to HomEq. Farrell Dec, Exhibits M, N, O & Q. However Perera does not know what he can deduct from taxes and knows little about mortgages. Perera Dec, ¶ 9.

## DISCUSSION

I. **Alegis's Motion**

Alegis contends that Perera's only recourse, if any, falls under the Bankruptcy Code and that, in addition, Perera is estopped by his conduct from asserting that the lien is invalid. Based on controlling Ninth Circuit law, this court concludes that Perera's claims against Alegis are precluded by the Bankruptcy Code.

A. **Exclusive Bankruptcy Court Remedy**

According to Alegis, Perera's claims arise from Alegis's attempt to collect a debt that was discharged in bankruptcy. Because these claims arise from presumed violations of the bankruptcy court's automatic stay or discharge order, Alegis argues that the proper enforcement tool for violations of the discharge injunction of the bankruptcy court is the exclusive remedy of contempt under 11 USC § 105(a), rather an FDCPA claim or other state law claims.

Alegis relies on *Walls v. Wells Fargo Bank*, 276 F3d 502, 507-10 (9th Cir 2002), which involved an attempt by Wells Fargo to collect a debt from Walls after it had been discharged by the bankruptcy court under Chapter 7. The debt was secured by Walls's house. Because Walls remained current on her loan payments before and after her debt was discharged, she was able to keep her house after the bankruptcy under a "ride-through" allowed by *In re Parker*, 139 F3d 668, 672-73 (9th Cir 1998), without making a statutory election whether to redeem the property or reaffirm the debt pursuant to 11 USC § 524(c). This meant that Wells Fargo Bank retained its lien against the property and could foreclose in the event that Walls did not make payments. After Walls stopped paying, Wells Fargo Bank foreclosed on the house. Contending that her debt was discharged because Wells Fargo did not obtain an agreement reaffirming its debt under 11 USC § 524(c), Walls filed a class action on behalf of all Chapter 7 bankruptcy debtors against Well Fargo Bank seeking damages for violating both the FDCPA and the discharge injunction set forth in 11 USC § 524.

The Ninth Circuit began its analysis by holding that there is no private right of action for enforcement of the discharge injunction directly under 11 USC § 524 and that a debtor has only a cause of action for civil contempt under 11 USC § 105(a). Enforcement is then left "to the bankruptcy judge whose discharge order gave rise to the injunction." *Walls*, 276 F3d at 509.

"[C]ivil contempt is the normal sanction for violation of the discharge injunction" and allows the bankruptcy court to award compensatory damages and attorney fees. *Id* at 507.

The court then addressed Walls's FDCPA claim. It observed that the FDCPA claim "necessarily entails bankruptcy-laden determinations" because the court would have to decide whether Walls's payments were voluntary under § 524(f), whether Wells Fargo was required to enter into a reaffirmation agreement with Walls pursuant to § 524(c), and how much of a free ride was afforded by her "ride through." *Id* at 510. Since those issues were completely unrelated to the FDCPA, the court concluded that the Bankruptcy Code precluded a simultaneous FDCPA claim, explaining:

> To permit a simultaneous claim under the FDCPA would allow through the back door what Walls cannot accomplish through the front door – a private right of action. This would circumvent the remedial scheme of the Code under which Congress struck a balance between the interests of debtors and creditors by permitting (and limiting) debtors' remedies for violating the discharge injunction to contempt. . . . Nothing in either [the Bankruptcy Code or the FDCPA] persuades us that Congress intended to allow debtors to bypass the Code's remedial scheme when it enacted the FDCPA. While the FDCPA's purpose is to avoid bankruptcy, if bankruptcy nevertheless occurs, the debtor's protection and remedy remain under the Bankruptcy Code.

*Id* at 510.

Most other courts that have considered this issue have come to a similar conclusion. *See Wan v. Discover Fin. Serv., Inc.,* 324 BR 124 (Bankr ND Cal 2005); *Degrosiellier v. Solomon & Solomon, PC,* 2001 WL 1217181 (NDNY 2001); *Kibler v. WFS Fin.,* 2000 WL 1470655 (CD Cal 2000); *Baldwin v. McCalla, Raymer, Padrick, Cobb, Nichols & Clark, LLC,* 1999 WL 284788 (ND Ill 1999). However, one court has limited the holding in *Walls* to the facts from

which it arose, namely class action suits against original creditors who had themselves been specifically enjoined by the Bankruptcy Court for trying to enforce a debt. *Forsberg v. Fidelity Nat'l Credit Serv., Ltd.,* 2004 WL 3510771, *7 (SD Cal 2004). That court also noted that, unlike *Walls,* the debtor did not bring a simultaneous claim under 11 USC § 524. *Id.* As a result, it declined to follow *Walls. Id.*

However, other courts have decided, contrary to *Walls*, that a FDCPA claim is not precluded by the Bankruptcy Code. *Peeples v. Blatt*, 2001 WL 921731 (ND Ill 2001); *Wagner v. Ocwen Fed. Bank, FSB*, 2000 WL 1382222 (ND Ill 2000); *Molloy v. Primus Auto. Fin. Servs.*, 247 BR 804 (Bankr CD Cal 2000). The only other Court of Appeals to have considered this issue also reached this same conclusion. In *Randolph v. IMBS, Inc.*, 368 F3d 726, 730 (7th Cir 2004), the Seventh Circuit noted that "[o]ne federal statute does not preempt another." Instead, "[w]hen two federal statutes address the same subject in different ways, the right question is whether one implicitly repeals the other -- and repeal by implication is a rare bird indeed." *Id* (citations omitted). Absent irreconcilable conflict or a clear expression by Congress attempt for one to supplant the other, the well-established approach is that the "overlapping and not entirely congruent remedial systems" should be understood as co-existent. *Id* at 730-32. Unlike the Bankruptcy Code, the FDCPA regulates debt collectors rather than creditors, imposes a strict liability rule with a *bona fide* error defense, has a one year statute of limitations, authorizes statutory damages up to $1,000 and compensatory damages, but does not allow recovery of punitive damages. *Id* at 730. The Seventh Circuit found that these operational differences between the two federal statutory schemes may overlap, but do not present an irreconcilable conflict. *Id.* The court concluded that permitting remedies under the FDCPA "would not

contradict any portion of the Bankruptcy Code, which therefore cannot be deemed to have repealed or curtailed Section 1692e(2)(A) [of the FDCPA] by implication. To the extent *Walls* holds otherwise, we do not follow it." *Randolph*, 368 F3d at 732-33. Accordingly, it allowed a debtor to sue a debt collector for alleged violations of the FDCPA arising out of attempts to collect a debt listed in a Chapter 13 bankruptcy plan. *Id*, 368 F3d 726.

Alegis contends that *Walls* requires this court to dismiss Perera's claims and limit his remedy to a civil contempt action before the Bankruptcy Court. Although this court is persuaded by the sound reasoning of *Randolph*, it is bound to follow the law of the Ninth Circuit as expressed in *Walls*. Established Ninth Circuit precedent can only be affected by *en banc* panel of this circuit or by a clearly conflicting act of Congress or Supreme Court decision. *United States v. Edwards*, 13 F3d 291, 294 (9th Cir 1993), *vacated on other grounds*, 514 US 1093, *on remand,* 55 F3d 428 (9th Cir 1995) (citations omitted); *Arnold v. United Artists Theatre Circuit, Inc.*, 158 FRD 439, 463 (ND Cal 1994). Thus, this court cannot disregard the Ninth Circuit's holding in *Walls* even though it finds the Seventh Circuit's reasoning more compelling.

Perera's attempt to distinguish *Walls* factually must be rejected. Unlike *Walls*, this case does not involve a class action or the original creditor (Blue Ribbon). Instead, it parallels *Forsberg* since it involves a claim by a debtor in his individual capacity against an assignee of the creditor who was not specifically enjoined by the bankruptcy court. *Forsberg*, however, did not analyze how those factual differences are material to the analysis in *Walls* and thus provides little assistance. In this court's view, such factual differences are strained and immaterial. The primary concern by the Ninth Circuit in *Walls* was not allowing a debtor to "circumvent the remedial scheme of the Code under which Congress struck a balance between the interests of

debtors and creditors by permitting (and limiting) debtors' remedies for violating the discharge injunction to contempt." *Walls*, 276 F3d at 510. From that standpoint, it makes no difference whether the claim is by an individual or a class or whether the defendant is a creditor or an assignee of the creditor.[1] Perera also notes that unlike the plaintiff in *Walls* and like the plaintiff in *Forsberg*, he does not simultaneously seek relief under 11 USC § 524 of the Bankruptcy Code. However, that fact does not minimize the degree to which Perera's claims may be intertwined with Bankruptcy Court proceedings. *Also see Wan,* 324 BR at 127-28 (applying *Wells* to an FDCPA counterclaim in an adversary proceeding when no simultaneous claim alleged for violation of 11 USC § 524).

Also unlike *Walls,* the alleged violations of the FDCPA by Alegis concern acts which occurred solely in the post-bankruptcy period. The debt at issue was discharged by the Bankruptcy Court on February 21, 2003, which is the same date that Alegis sent notice to Perera that the loan had been assigned. Not until October 5, 2004, some 18 months later, did Alegis begin its efforts to foreclose on Perera's home. Perera contends that he suffered no damage until he tried to refinance his house and that he could not have filed his claims until he suffered damage.

On the other hand, Perera's bankruptcy counsel and HomEq (which subsequently assigned the loan to Alegis) communicated prior to the bankruptcy discharge about the existence of a security interest. Therefore, Perera had notice of a potential dispute over whether the Loan was secured that could have been resolved in the course of his bankruptcy. A communication

---

[1] This court assumes that Alegis, as an assignee of Blue Ribbon, is subject to the jurisdiction of the Bankruptcy Court for allegedl violating the discharge injunction. Alegis has not contended otherwise. However, if it should so contend before the Bankruptcy Court, then Perera would be left with no remedy and this court would allow Perera to pursue a FDCPA claim.

between the creditor and debtor during the pendency of the bankruptcy discussing the debtor's rights in bankruptcy, "raises an even greater concern about potential overlap and conflict between the Bankruptcy Code and the FDCPA than was present in *Walls*." *Wan*, 324 BR at 127. Although Perera did not suffer any damage until post-bankruptcy, he still has the option of pursuing the remedy of a contempt action against Alegis in Bankruptcy Court.

Perera also contends that his alleged violations of the FDCPA do not involve any violation of an automatic stay or any other order of the Bankruptcy Court emanating from the pre-discharge period. That argument must be rejected. Perera alleges that Alegis violated 15 USC § 1692 in five ways:

> (a)  Threatening to take an action that cannot legally be taken or that is not intended to be taken in violation of 15 USC § 1692e(5);
> (b)  Attempting to collect fees that were discharged in bankruptcy or were not otherwise collectable in violation of 15 USC § 1692e(7);
> (c)  In engaging in conduct designed to harass, or oppress, or abuse Plaintiff in violation of 15 USC § 1692d;
> (d)  Contacting Plaintiff by phone demanding payment when Defendants knew that Plaintiff was represented by legal counsel in violation of 15 USC § 1692a; and
> (e)  Threatening repossession when there was no present right to possess without further legal proceedings in violation of 15 USC § 1692f.

Complaint, ¶ 5.7.

Three of those five allegations, namely subparagraphs (a), (b), and (e), clearly occurred in the context of attempting to collect a debt discharged in bankruptcy. Had Perera's debt not been discharged, Alegis's attempt to collect the debt would not have threatened any illegal action, attempted to collect fees that were discharged in bankruptcy, or threatened repossession with no present right to possess in violation of the FDCPA. The only possible implication of

these allegations is that Alegis's debt collection was unlawful because the debt was not collectible in violation of the discharge injunction granted by the Bankruptcy Court.

The other two allegations are simply another variation on the same theme that Alegis attempted to collect a debt in violation of Perera's bankruptcy discharge. The only contact Alegis had with Perera was to collect a debt which Perera claims was discharged by his bankruptcy. Absent the Order of Discharge, nothing in the record supports any conduct by Alegis that can be said to have harassed, or oppressed, or abused Perera in violation of 15 USC § 1692d. That leaves only the allegation in subparagraph (d) that Alegis contacted Perera by telephone demanding payment, knowing that he was represented by legal counsel, in violation of 15 USC § 1692a. This allegation refers to representation by Perera's bankruptcy attorney. Affidavit of Michael J. Farrell in Support of Defendant Alegis Group L.P.'s Reply, Exhibit A (Perera Depo), p. 115. Although the record is not clear, this telephone contact occurred several times and sometimes twice a month. *Id*. Since Alegis did not acquire the Loan until February 21, 2003, its contacts with Perera must have occurred post-bankruptcy. At that time, Alegis may not have known that Perera was still represented by bankruptcy counsel. But even if Alegis should have known that Perera was still represented by his bankruptcy counsel, Perera only had bankruptcy counsel because of his bankruptcy proceedings. Absent Perera's bankruptcy, Alegis would have done nothing wrong by attempting to collect the debt initially from Perera because he would have had no bankruptcy attorney. In other words, Perera's claims do not exist but for his bankruptcy proceeding.

The key issue in this case is whether or not the security for the debt survived the bankruptcy discharge. Resolution of that dispute raises issues best handled by the Bankruptcy

Court which has greater familiarity with the obligations imposed on debtors and creditors under the Bankruptcy Code.

If Blue Ribbon did acquire a valid security interest, Perera may still have some legal argument to prevent foreclosure. By contesting the security interest in correspondence to HomEq during his bankruptcy, he contends that HomEq should have filed a secured claim or an adversary proceeding and that he was not obligated to make payments or the statutory election whether to redeem the Property or reaffirm the debt. Alegis responds that Perera should have notified his Chapter 7 trustee of that lien dispute, amended his schedules to reflect that lien dispute, and challenged the lien pursuant to 11 USC § 544(b)(1), under which a lien may be avoided "under applicable law" such as fraud or forgery. *See In re Fisher*, 320 BR 52, 69 (Bankr ED Pa 2005) (Trustee allowed to avoid a mortgage under 11 USC § 544 based on evidence of fraud or forgery).

On the other hand, if Perera proves that Blue Ribbon acquired no enforceable security interest in the Property, then the debt was unsecured and discharged by his bankruptcy. However, Alegis points out that the Bankruptcy Court may deny a discharge if the debtor intentionally conceals property of the estate. 11 USC § 727(a)(2). Although any claim against Alegis did not arise until post-bankruptcy, the potential Notary Act violation, slander of title, and fraud claims against Blue Ribbon and Gann arose and were known to the Perera during the pendency of his bankruptcy case when his counsel received a copy of the recorded Deed of Trust containing Gann's notary. Perera did not amend his schedules to list these potential claims as an asset. By failing to list these assets, the Trustee was denied any opportunity to pursue these claims for the benefit of Perera's creditors. Had he disclosed this asset and had the Trustee

successfully pursued these claims, Perera's creditors may have received some payment from the bankruptcy estate.

Even though Perera received a discharge, Alegis asserts that his failure to disclose assets would warrant a revocation of his discharge. Pursuant to 11 UCC 727(e)(2), however, a request for revocation of discharge based on fraud must be made within one year of the granting of the discharge or the date the case was closed, with no equitable tolling allowed. *In re Ford*, 159 BR 590, 592-93 (Bankr D Or 1993); *cf In re Peebles* 224 BR 519, 520 (Bankr D Mass 1998). Although it now may be too late to revoke Perera's discharge, the creditors could move to reopen the bankruptcy to allow the Trustee to recover property of the bankruptcy estate to pay pre-petition claims. *See In re Blanchard*, 241 BR 461, 466 (Bankr SD Cal 1999).

Perera asserts that he had no obligation to pursue these claims in Bankruptcy Court and that the Chapter 7 Trustee would have had little incentive to file a motion under 11 USC § 544(b)(1) to void the lien since Perera's house was only worth $102,000 with a $95,000 first lien and a $25,000 homestead exemption. He also asserts that he could not have brought a claim for slander of title or fraud against Blue Ribbon or Gann until he suffered damage and that he did not suffer any damages until he tried to refinance his house.

The court makes no ruling with respect to these issues, but simply notes that Perera's failure to list potential claims against Blue Ribbon and Gann may be a matter of significance if this case were returned to the Bankruptcy Court or if the creditors seek to reopen Perera's bankruptcy.

In sum, this court concludes that despite persuasive authority in other jurisdictions, *Walls* governs this case and is not factually distinguishable. As a result, Perera's FDCPA claim is precluded by the Bankruptcy Code.

Perera also alleges two state court claims against Alegis for violations of the OUDCPA (Third Claim) and slander of title (Fourth Claim). Although the courts are divided concerning whether claims for violations of the FDCPA are pre-empted by the Bankruptcy Code, the vast majority of courts have held that the Bankruptcy Code preempts state law claims that are based upon allegations that the defendant violated the Bankruptcy Code. *See, e.g., MSR Exporation, Ltd. v. Meridian Oil, Inc.*, 74 F3d 910 (9th Cir 1996) (finding claim for malicious prosecution based on the filing of false claims against the bankruptcy estate was preempted); *Diamante v. Solomon & Solomon, P.C.,* 2001 WL 1217226, *2 (NDNY 2001) (finding claims for conversion, abuse of process and intentional infliction of emotional distress based on attempted collection of a debt discharged by bankruptcy were preempted); *Bessett v. Avco Fin. Servs., Inc.*, 240 BR 147 (Bankr D RI 1999) (finding claim for unjust enrichment based on collection of debt discharged by bankruptcy was preempted), *aff'd in part, vacated in part on other grounds*, 230 F3d 439 (1st Cir 2000); *Holloway v. Household Auto. Fin. Corp.*, 227 BR 501 (ND Ill 1998) (finding claim under Illinois Consumer Fraud and Deceptive Practices Act for fraudulently valuing a secured claim against the estate was preempted); *Pereira v. First N. Am. Nat'l* Bank, 223 BR 28 (ND Ga 1998) (finding state law claims for unjust enrichment and accounting were preempted); *In re Shape, Inc.,* 136 BR 707 (D Me 1992) (finding claim under Massachusetts Consumer Protection Act based upon violation of the automatic stay was preempted). These courts reason that the remedial scheme of the Bankruptcy Code for addressing violations preempts state law claims

based upon such violations. Unlike the difficulty in reconciling two conflicting federal statutes as noted in *Randolph*, preemption of state law by federal law may be readily inferred based on exclusive federal court jurisdiction over bankruptcy matters, the need to prevent interference by state courts "with the whole complex, reticulated bankruptcy process itself," and the need for uniformity. *MRS Exploration,* 74 F3d at 914. Perera's state law claims are based on the same conduct which forms the basis of the FDCPA claim, namely Alegis's attempt to collect a debt that allegedly was discharged by bankruptcy. Because Perera's state court claims also are intimately intertwined with an alleged violation of the automatic stay, they are precluded by the Bankruptcy Code.

As a result, Alegis should be granted summary judgment against Perera's First, Second, Third and Fourth Claims.

## B. Equitable Estoppel

Alegis also contends that because Perera comes to this court with unclean hands, he is estopped to pursue his claims. Although Alegis should be entitled to summary judgment as discussed above, this court will briefly address this issue as well.

Alegis asserts that Perera has come to the court with unclean hands for several reasons. First, he strategically choose to avoid Bankruptcy Court by filing his case in this court. Second, he failed to list his claims against Blue Ribbon and Gann as assets in his bankruptcy case. And third, he claimed a deduction on his tax returns for the tax years 2000, 2001, and 2002 for interest paid to HomEq as home mortgage, confirming that the Loan was secured.

The doctrine of unclean hands has been expressed as follows:

> [E]quity refuses to lend its aid in any manner to one seeking its active interposition, who has been guilty of unlawful or inequitable conduct in the matter with relation to which he seeks relief. Equity denies affirmative relief for such conduct . . . *"'The maxim is based on conscience and good faith. It is not strictly or primarily a matter of defense, but is invoked on grounds of public policy and for the protection of the integrity of the court.'"*

*Rise v. Steckel,* 59 Or App 675, 681, 652 P 2d 364, 368-69 (1982), *rev denied*, 274 Or 212, 656 P2d 943 (1982) (emphasis in original) (citations omitted).

This doctrine "applies to any party who seeks either the affirmative or defensive intervention of the court for equitable relief." *Id*, 50 Or App at 681, 652 P2d at 369.

Alegis is not entitled to assert this affirmative defense for several reasons. First, any unclean hands defense bars only claims for equitable relief. The only claim alleged by Perera for equitable relief is his claim for declaratory judgment. His other claims seek damages. *See Welsh v. Case,* 180 Or App 370, 385, 43 P3d 445, 454 (2002) ("'Unclean hands' is an equitable doctrine under which the court, in order to protect its own integrity, will deny equitable relief to a party . . ."); see also *Miller v. Beneficial Mgt Corp.,* 855 F Supp 691, 717 n 28 (D NJ 1994) ("[E]quitable defenses, such as the unclean hands defense, are generally not applicable to bar claims seeking legal remedies.").

Second, this court rejects two of the reasons given by Alegis for invoking the doctrine of unclean hands. Choosing a particular legal strategy to file a case in a particular court may prove to be wise or unwise, but cannot in any sense be deemed inequitable. Failing to list claims against Blue Ribbon and Gann as assets in the bankruptcy case similarly does not constitute

unclean hands with respect to Alegis. Instead, as a creditor, Alegis has a legal remedy under the Bankruptcy Code for that failure which should be invoked instead.

That leaves the third reason premised on Perera's misconduct of claiming interest on his tax returns for a secured debt while claiming that it was not secured. This inconsistency provides possible grounds for impeachment of Perera's credibility. But even if Perera engaged in misconduct, that is not the sole test for applying the unclean hands defense. In addition, the party invoking estoppel must have suffered some injury as a result of the misconduct.

> "'*Necessity for injury to complainant.* -- The party to a suit, complaining that his opponent is in court with "unclean hands" because of the latter's conduct in the transaction out of which the litigation arose, or with which it is connected, must show that he himself has been injured by such conduct, to justify the application of the principle to the case. '". . . If plaintiff did not rely on the defendant's concealment, he could not have been injured by it.

*Rise*, 59 Or App at 683-84, 652 P2d at 370 (citations omitted).

Here, Alegis has not suffered any injury as a result of Perera's tax returns. Furthermore, the filing of tax returns is not the transaction out of which this litigation has arisen. The tax deduction has nothing to do with the initial transaction.

Even if Alegis could invoke the unclean hands defense, fact issues preclude summary judgment. Perera lists his occupation on his tax returns as "trailer mechanic" and speaks English as a second language. Therefore, it is doubtful he commanded a detailed understanding of the difference between secured and unsecured debt and the way those differences are manifested under both the federal bankruptcy and tax codes. Perera states that he did not intentionally treat the debt as secured by taking the interest deduction on his taxes. Instead, he simply relayed to his tax preparer all the tax documents he compiled that year, including those associated with the

loan in question,[2] without any knowledge that the deductablity of the interest depends on whether the debt was secured.  Perera's tax preparer would be likely to take the information on such financial statements at face value and submit Perera's tax return without making further inquires.  Though inconsistent with his allegations here, this conduct may not rise to the level of an intentional misrepresentation of fact required to invoke equitable estoppel.  This is an issue of fact that cannot be resolved on summary judgment.[3]

## II.    Gann's Motion

The Fourth Claim alleges that Gann, a licensed notary who worked for Blue Ribbon, fraudulently notarized the disputed Deed of Trust that purportedly secures the Loan. This claim rests on Perera's statement that the Deed of Trust was not notarized in his presence in violation of ORS 194.166(11) (2003).  That statute, in conjunction with ORS 194.200 (2003), provides a civil cause of action for actual damages suffered by a person who is harmed by the "[c]ommission of any act involving dishonesty, fraud or deceit with the intent to substantially benefit the notary public or substantially injure another."

Perera's Fifth Claim for fraud rests on the same premise and the further allegation that Gann served as an accomplice of the other defendants who harmed Perera by fraudulently recording a falsely notarized  deed of trust.

---

[2] There is no evidence in the record that Alegis/HomEq sent paperwork such as this to Perera. However, secured creditors customarily send annual statements like this for tax purposes, and its likely that Alegis did as well.

[3] However, should Perera ultimately prevail on his claim that the debt was unsecured, equity will require him to amend his prior tax returns.

Gann moves for summary judgment against both claims. She incorporates the reasons raised by Alegis in its motion and also contends that the undisputed facts do not support a claim against Gann. Although factual issues preclude summary judgment on the merits, this court concludes that Perera's claims against Gann are barred by judicial estoppel.

### A.      Reasons Raised by Alegis

Because the claims alleged against Gann are not based on conduct that would violate the Bankrutpcy Code, the argument by Alegis premised on the exclusive remedy of the Bankruptcy Code does not assist Gann. And for the same reasons that Alegis cannot invoke the unclean hands defense, Gann also cannot invoke that defense. Thus, this court turns to the other arguments made by Gann for summary judgment.

### B.      Merits

Gann also claims that Perera has no evidence that she committed any act involving "dishonesty, fraud or deceit" in violation of ORS 194.200 or that she committed fraud. In support of her argument, Gann submits her deposition testimony describing how she worked as a notary in the states of Oregon and Washington in 1999, had her own business (CJ's Business and Notary Service), and worked for Blue Ribbon as a subcontractor. She took loan papers to customers' homes, went over the loan papers, and, if a notary was required, notarized the signature. Gann Depo, pp. 12-13, 16. Following those transactions, the accounts would be assigned by Blue Ribbon to The Money Store or some other lender; Gann did not handle those assignments. *Id* at 16-18.

While Gann has no specific recollection of the precise date she went to Perera's home, she recognized Perera as someone she had seen before (*id* at 18) and after looking at a

photograph of Perera's home, was positive she had been in his house. She recalled that she had

to go in the side door instead of the front door and that Ray Knichel, a Blue Ribbon employee

who was installing the siding, was present at the time. *Id* at 18, 43-46. She also testified that it

was her practice to drive down to Portland to meet the customer at the appointed time at his

home, go over the loan papers with him, and have him sign the deed of trust and other

documents that were required to be executed. *Id* at 20. The Line of Credit Deed of Trust dated

December 11, 1999, and signed by Perera contains her notary and stamp. This is consistent with

her practice for an installment contract secured by real property. *Id* at 34-36.

Gann notes that Perera admits signing paperwork. Perera Depo, p. 50. Perera

acknowledges that it is possible he did sign the documents that are the subject of his claims

against Gann and that the signature on the documents looks like his. *Id* at 70, 72-75. Gann

concludes that these facts demonstrate that there is no genuine issue regarding any material fact

and that she is entitled to judgment as a matter of law.

This court disagrees. Although Perera did sign the Retail Installment Contract on

December 11, 1999, the contract did not mention any security interest, and he did not knowingly

sign – and is "pretty sure" that he did not sign – a Deed of Trust. Perera Dec, ¶ 6. Although he

concedes that it is possible that he was "tricked" into signing the Deed of Trust when signing

other documents, he "did not read or speak English very well" and "was not given a copy of

Deed of Trust or any other mortgage documents." *Id*. He also claims that he never met Gann

prior to her deposition in June 2005. *Id*, ¶ 7.

Gann's notary journal would certainly trump Perera's contrary recollection, but the

notary journal is gone. Gann is unable to demonstrate that Perera's signature was properly

notarized because her notary journal for the State of Oregon was lost in a flood in the basement of her home in approximately January 2004. Gann Depo, pp. 22-24. She took the damaged records to the dump because she did not think she would ever need them again. *Id.*

ORS 194.152 creates a duty, requiring that "[e]ach notary public *shall* provide, keep, maintain and *protect* one or more chronological journals of notarial acts performed . . . " (emphasis added). Oregon administrative regulations require that notaries keep their journal and seal secured at all times, and specify that "[t]he earliest date the journal may be destroyed" is "seven years" after the "last commission in which entry was made in the journal." OAR 160-100-0200(4)(e). By failing to adequately protect her journals and later taking them to the dump because she no longer needed them, Gann violated these requirements, which serves to cast doubt on her credibility. As a result, this court is left solely with the testimony of Perera which directly contradicts the testimony of Gann. Resolution of this contradiction necessarily rests on credibility of the witnesses, precluding summary judgment in favor of Gann.

Alternatively, Gann submits that even if an issue of fact exists as to whether she improperly notarized the Deed of Trust, she argues that she did not "substantially benefit" from any violation of the Notary Act. However, Gann admits that she received $125 for performing the notary service at issue, far higher than the maximum fee of $5. ORS 194.164(1); OAR 160-100-0400 (2005). Although she traveled from Seattle to Portland to provide the notary service, a notary public may only charge a travel fee, separate from the notarial fee, that is agreed upon prior to meeting the customer. ORS 194.164(2); OAR 160-100-0610(29). Furthermore, she had an on-going subcontractor relationship with Blue Ribbon to provide other notary services. Whether this is a sufficiently substantial benefit to violate the Notary Act is an issue of fact.

Gann also contends that Perera's claim for emotional distress damages lacks the requisite measure of harm to be actionable, and that fraudulently notarizing a document could never cause such injuries. To the contrary, it is entirely foreseeable that the falsification of home loan documents might cause emotional distress when they are enforced through foreclosure or when a request for refinancing is rejected. Also unavailing is Gann's argument that the emotional distress associated with these event is too trifling to actionable. Congress was sufficiently concerned with this sort of harm to make it actionable under the FDCPA. Therefore, it would be improper for this court to dismiss the case based on insufficiency of harm.

In sum, a genuine issue of material fact precludes summary judgment in Gann's favor on either claim alleged against her.

**C.      Judicial Estoppel**

Gann also asserts that Perera's claims are barred because they represent significant assets that should have been listed by Perera in his bankruptcy proceeding so that his creditors might have the benefit of them.

Perera responds that he had no obligation to pursue these claims in Bankruptcy Court. However, a debtor has a continuing duty to disclose any possible claims of which he becomes aware during a pending bankruptcy case, including contingent and unliquidated claims. 11 USC § 521(1). "The duty of disclosure in a bankruptcy proceeding is a continuing one, and a debtor is required to disclose all potential causes of action." *In re Coastal Plains,* 179 F3d 197, 208 (5th Cir 1999), *cert denied,* 528 US 1117 (2000), quoting *Youngblood Group v. Lufkin Fed. Sav. & Loan Ass'n*, 932 F Supp 859, 867 (ED Tex 1996). Failure to do so results in the bar of judicial estoppel.

"Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F3d 778, 782 (9th Cir 2001), citing *Rissetto v. Plumbers & Steamfitters Local, 343*, 94 F3d 597, 600-01 (9th Cir 1996) and *Russell v. Rolfs,* 893 F2d 1033, 1037 (9th Cir 1990). The Ninth Circuit invokes judicial estoppel "not only to prevent a party from gaining an advantage by taking inconsistent positions, but also because of 'general consideration[s] of the orderly administration of justice and regard for the dignity of judicial proceedings,' and to 'protect against a litigant playing fast and loose with the courts.'" *Id*, *citing Russell,* 893 F2d at 1037. Because it is intended to protect the integrity of the judicial process, judicial estoppel "is an equitable doctrine invoked by a court at its discretion." *Russell*, 893 F2d at 1037.

A court "may" consider three factors in determining whether to apply the doctrine of judicial estoppel: (1) "a party's later position must be clearly inconsistent with its earlier position;" (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled;" and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Hamilton*, 270 F3d at 782-83, quoting *New Hampshire v. Maine,* 532 US 742 (2001) (internal quotations and citations omitted).

As recently stated by the Ninth Circuit, "[i]n the bankruptcy context, a party is judicially estopped from asserting a cause of action not raised in a reorganization plan or otherwise

mentioned in the debtor's schedules or disclosure statements." *Hamilton*, 270 F3d at 783; *see also Hay v. First Interstate Bank of Kalispell, N.A.*, 978 F2d 555, 557 (9th Cir 1992) (failure to give notice of a potential cause of action in bankruptcy schedules and disclosure statements estops the debtor from prosecuting that cause of action); *In re Coastal Plains,* 179 F3d at 208 (holding that a debtor is barred from bringing claims not disclosed in its bankruptcy schedules); *Payless Wholesale Distrib., Inc. v. Alberto Culver (P.R.) Inc.,* 989 F2d 570, 572 (1st Cir ), *cert denied,* 510 US 931 (1993) (debtor who obtained relief on the representation that no claims existed cannot resurrect such claims and obtain relief on the opposite basis); *Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F2d 414, 419 (3rd Cir), *cert denied,* 488 US 967 (1988) (debtor's failure to list potential claims against a creditor "worked in opposition to preservation of the integrity of the system which the doctrine of judicial estoppel seeks to protect," and debtor is estopped by reason of such failure to disclose).

Unlike the FDCPA claims against Alegis, the alleged conduct by Gann occurred prior to the bankruptcy proceedings, and Perera's attorney received a copy of the recorded Deed of Trust containing Gann's notary during the pendency of the bankruptcy. However, Perera contends that his claims for slander of title or fraud against Blue Ribbon or Gann did not ripen until he suffered damage and that he did not suffer any damages until he tried to refinance his house. While certain damage based on an invalid lien may not have occurred until then, Perera knew or should have known that the existence of an invalid lien against his Property would cause problems in the future. It not only slandered his title, but diminished the value, marketability, and ability to borrow against the Property and would have entitled him to recover some compensatory and punitive damages on the slander of title and fraud claims. Furthermore, if

Gann violated ORS 194.166(11), then Perera would be entitled to recover at least $200, even if he suffered no actual damages, plus punitive damages and attorney fees. ORS 194.200(1).

Admittedly, the amount of potential recovery from these claims may not have been high enough to interest the Trustee in pursuing them. But they were potential claims, and the question is whether Perera had an obligation to attempt to resolve the lien dispute during his bankruptcy. Even without much of a claim for damages against either Blue Ribbon and Gann, he had an opportunity to avoid any future damage by attempting to invalidate the lien. By not disclosing the lien dispute and his potential claims, despite his duty to do so, the doctrine of judicial estoppel prevents him from now asserting claims for damages. Those claims remain an asset of the bankrupt estate for the benefit of the creditors. For this reason, Gann's motion for summary judgment should be granted.

## III.   **Blue Ribbon**

If both Alegis and Gann are granted summary judgment, the only claims remaining are the Fourth and Fifth Claims against Blue Ribbon for slander of title and fraud. Both claims are premised on Blue Ribbon obtaining an invalid security interest. The slander of title claim alleges that the improper lien slanders the title of the Property. The fraud claim alleges that Blue Ribbon falsely represented that the Loan was unsecured and failed to disclose its true intent to record a false Deed of Trust with a false notary.

The alleged conduct by Blue Ribbon arose prior to Perera's bankruptcy petition and was known or should have been known by Perera during the pendency of his bankruptcy. Therefore, based on the doctrine of judicial estoppel discussed above, Perera is barred from pursuing any

claim for damages against Blue Ribbon. Although Blue Ribbon did not file a motion for summary judgment, this court should *sua sponte* grant summary judgment to Blue Ribbon.

"Sua sponte entry of summary judgment is proper if 'there is no genuine dispute respecting a material fact essential to the proof of movant's case . . . .'" *Buckingham v. United States*, 998 F2d 735, 742 (9th Cir 1993) quoting *Cool Fuel, Inc. v. Connett*, 685 F2d 309, 311 (9th Cir 1982). "However, a litigant must be given reasonable notice that the sufficiency of his or her claim will be in issue . . . ." *Id.* "Reasonable notice implies adequate time to develop the facts on which the litigant will depend to oppose summary judgment." *Portsmouth Square Inc. v. Shareholders Protective Comm.*, 770 F2d 866, 869 (9th Cir 1985).

Because Perera's claims against Blue Ribbon are barred for the same reason as his claims against Gann, *sua sponte* entry of summary judgment is proper. Perera had sufficient notice that Blue Ribbon would likely made the same arguments for summary judgment as the other defendants.

## **RECOMMENDATION**

For the reasons set forth above, defendant Alegis's Motion for Summary Judgment (docket # 32) and defendant Gann's Motion for Summary Judgment (docket # 40) should be GRANTED. In addition, this court should *sua sponte* grant summary judgment to defendant Blue Ribbon and enter a Judgment dismissing all claims.

## **SCHEDULING ORDER**

Objections to the Findings and Recommendation, if any, are due **October 28, 2005.** If no objections are filed, then the Findings and Recommendation will be referred to a district court judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district court judge and go under advisement.

DATED this 7th day of October, 2005.

s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge